By the Court.—Sedgwick, Ch. J.
The action was for an accounting in respect of mutual dealings between the parties that concerned the construction of a railway for the Wheeling & Lake Erie Railroad Company. The answer averred that there had been a final settlement in respect of the dealings, and that if there were a new accounting the plaintiff would be found to be largely indebted to the defendants. The referee held that there should be an accounting and proceeded to take it.
The referee found that, about September 24,1879, a contract was made between the plaintiff and the Wheeling & Lake Erie Railroad Company.
It is not at present necessary to give all the provisions of the contract. For the purpose of the contract, it declared that the railroad to be built should *388 be deemed to consist of three divisions. The plaintiff agreed to do everything necessary to the beginning and completion and operation of a railroad over the first and second divisions, and over so much of the third division as thereafter should be found to be expedient. The company agreed to pay to the plaintiff, from time to time,.certain amounts of fully paid for shares of stock and of bonds of the company.
The company further agreed to furnish to the plaintiff, $4,000 a mile of the first and second divisions, to be applied to obtaining the right of way, to bridging and tieing, and to use its best endeavors to furnish like money for the third division. The plaintiff was not required to begin or continue the work until he had received from the company notice that it was ready to furnish the money as it had agreed..
It was further agreed that the company should issue to trustees, for the use of the contractor, the plaintiff, $3,500,000 of its first mortgage bonds and $3,500,000 of fully paid for shares of its capital stock, and that upon the completion of each section of five miles the trustees should deliver the bonds and stock to the plaintiff at the rate of $15,000 of each mile of track. .
It was further agreed that upon the written consent of the president of the company, the contractor, the plaintiff, should be -allowed to draw bonds from said trustee for the purpose of buying iron, material and rolling stock for any division of the railroad, or of hypothecating the said bonds for that purpose to an amount equal to those he would be entitled to upon the completion of a division, with the understanding and agreement that the title of the property so procured shall vest at once in the company and not in the contractor.
After the execution of the contract the company *389 executed and delivered to The Farmers’ Loan & Trust Company, $3,500,000 of shares of stock and 3,500 of its bonds for the payment of $1,000 each and a mortgage to secure the payment of the bonds.
About July 10, 1880, the company gave to the plaintiff the notice that it had means to pay him, under the contract, for the grading, bridging and tieing of the road.
Before December 17, 1880, the trustees had delivered, as provided in the contract, 3,307 of the bonds of the company.
In November, 1880, the original defendant, C. K. Garrison, who since his death is represented by his executors, the defendants in this action, lent $15,000 to the plaintiff, upon his note and 100 of said bonds as security for its payment. In December, C. K. Garrison lent to the plaintiff $45,000, and as security for the re-pavment of it, plaintiff transferred to Garrison the 3.307 bonds above referred to. The writing which the plaintiff gave upon receiving the loan declared, “ I further authorize the sale of all or any part of said bonds at eighty-five per cent, net, and for every $15,000 of bonds sold by said Garrison or myself, or any other person, I agree to transfer to said Garrison, and authorize him to retain from any stock to be received under said construction contract, $7,000 of full paid stock over the amount of loan and interest to be paid. For a long time after this transaction Garrison furnished to the plaintiff large sums of money as means to the plaintiff of performing his obligation under the contract to construct and equip the railroad.
The company did not furnish, as it had agreed to furnish, money to the amount of $4,000 per mile wherewith to acquire a right of way and to grade, bridge or tie any part of any of the divisions of the railway, and Garrison promised to plaintiff to ad *390 vanee, and did advance for such purposes and from time to time, large sums of money.
On the 20th of December, 1881, the board of the trustees of the company adopted certain resolutions. They recited that the company had failed to comply with the agreement to furnish the plaintiff with means to acquire the right of way, and to bridge, grade and tie, and it authorized the plaintiff to make the necessary advances for such purposes in the future as he had in the past, and they authorized the president of the company, upon the report of a committee then appointed, to issue to the plaintiff or the assignee of his contract, for such amounts as he may have advanced for the right of way, &c., “ non-negotiable certificates of this company bearing interest at the rate of six per cent, payable sixty days after issuance.”
About January 1, 1882, the company issued, under this resolution, thirteen notes to the plaintiff. They amounted in gross to the sum qf $1,234,177.33. About the time they were issued to the plaintiff he transferred them to Garrison as security for advances made by him to and for the plaintiff. About February 20, 1883, the company issued to the plaintiff, under the resolution, eight other notes, for the aggregate amount of $715,533.39. The plaintiff transferred to Garrison these notes also as security. These twenty-one notes were for the amount in all of $1,949,710.72. The whole of that sum, excepting $175,000, had been advanced by Garrison to the plaintiff. The latter sum represented a compensation of ten per cent, which the contract had provided should be paid to the plaintiff.
The referee finds that it was “ understood and agreed by the parties that these promissory notes * * * * should be issued as a temporary expedient for the purpose of stating the accounts, and that, thereafter, as soon as practicable, second mortgage *391 bonds should be issued to secure or provide for said indebtedness and to take the place of said notes so temporarily issued.”
I do not think that the testimony shows that before April 19,1883, the parties had a definite understanding that second mortgage bonds should take the place of the notes. The whole of the understanding' was, that in some way, then not particularized, the second mortgage bonds should be used, e. g. to retire the notes, either by raising money upon the bonds and paying the notes with that money, or exchanging the bonds for the notes. The latter alternative would substitute the bonds as collateral security for the notes.
In the month of May, 1881, Garrison had purchased of the plaintiff 1,907 of the first mortgage bonds and gave the plaintiff credit in the account for the purchase price thereof, to wit, the sum of $1,620,950 and for the accrued interest. This is found in the 13th finding.
In the 25th finding it was found, that about April 1, 1882, “ the said Garrison gave the plaintiff credit in his accounts for 550 of the said first mortgage bonds at the rate of eighty-five per cent, of their par value, amounting to the sum of $467,500,” and also for the accrued interest.
On April 19, 1883, there was a meeting of the board of trustees of the company. The following letter was presented to the board :
“ New York, April 18th, 1883.
“ To the President and Directors of the Wheeling & Lake Erie B. E. Co.
“ Gentlemen :
“ As the contractor intends to turn over the road to the company on the 1st of May, 1883, I have to ask you to settle with me for the cash advances which I have made for your company, viz.:
*392 “ For" fire insurance on depot "building, rolling stock, &c., for one year 3,991 12
“ Coupons uncancelled (1st Mtg. Bonds)
“ Due May 1st, 1881.....$2,490 00
“ Interest.......... 297 80
“ Due Nov. 1st, 1881 ..... 60,000 00
“ Interest.......... 5,400 00
“ Due May 1st, 1882 ..... 76,500 00
“ Interest.......... 4,590 00
“ Due Nov. 1st, 1882 ..... 76,500 00
“Interest.......... 2,295 00
“'Due May 1st, 1883 ..... 76,500 00
304,572 80
“ Fornotesof the company.. 1,949,710 72
“ Interest......... 112,932 41
“ For notes of Co. to receive
about......... 78,705 63
2,141,348 76
“ Total amount due May 1st, 1883 . . . $2,449,912 68 “ For which I respectfully ask a settlement.
“ (Signed) C. K. Garrison.”
The referee finds (38th finding) that “ both the plaintiff and said Garrison were present at said director’s meeting, and said Garrison proposed, verbally, to accept- second mortgage bonds of the said railroad company at the rate of seventy-five- cents on the dollar in partial liquidation of the claim presented by him and set forth in the said communication, and thereupon the following action was taken by the said directors, as appears by the minutes of said meeting,” as follows : “ Moved by Mr. Wickham, that the president of this company be authorized to *393 sell and deliver to C. K. Garrison second mortgage bonds to the amount of $2,280,000 at the rate of seventy-five cents on the dollar and interest accrued from March 1,1883, the same to be delivered in part payment of his claim against this company, amounting to $2,449,912.68, as this day specified in his communication to this company. Seconded by Mr. Warwick and carried without dissent.”
The 39th finding is “ Soon thereafter the said Garrison received from the said railroad company 2,280 of the said second mortgage bonds of the par value of $1,000 each at the rate and price of seventy-five cents on the dollar, which price (including $26,000 for interest on said bonds from March 1, 1883 to May 1, 1883) amounted to $1,736,000, in exchange and payment for which the said Garrison delivered to said railroad company a portion of the said promissory notes.
The 41st finding is “ The remainder of the said promissory notes,.that is to say, those not exchanged for second mortgage bonds, amounting to the sum of $326,043.12, were, on or about the first day of May, 1883, surrendered or delivered to said railroad company by said C. K. Garrison, without consideration, and- were cancelled by said company. The value of said notes, when so surrendered, was the sum of $239,046.55.”
The 40th finding is “ The said exchange of said promissory notes for the said second mortgage bonds of said, railroad company was made with the knowledge, consent and approval of the plaintiff, and the said Garrison received and held the said bonds as collateral security in the place and stead of said promissory notes. The said 2,280 second mortgage bonds are still held by the defendants Day, Forrest and D. E. Garrison, the executors of the said Cornelius K. Garrison, now deceased.”
The referee held on this subject, that the taking of *394 the second mortgage bonds did not satisfy or extinguish the original indebtedness for which the notes were given as collateral security. And it did not if it is assumed that the second mortgage bonds were merely exchanged for, or substituted for, the notes. In the latter case,however,the defendants would be liable for the conversion of the second mortgage bonds, for there can hardly be a doubt that his claim, persisted in in the pleadings and at the trial, that they were not held as security but were his own by assignment from plaintiff, coupled with his dealing with them as his own property, as appears by his books in the statement of his assets, and then assigning them to Mr. Terry, for the benefit of his creditors, made a conversion. But the argument of the appellant did not claim anything on this score.
The appellant, however, claims that the transaction did result in the extinguishment of the original indebtedness wholly, and if not wholly atleastpartly, and to an extent which requires the reversal of the judgment. If the “exchange” said in the 40th finding to have been made with the knowledge, consent and approval of the plaintiff, refers to the actual transaction described in the 39th finding as distinguished from the agreement in the form and intrinsic character of the transaction, as disclosed by the testimony, to which attention will be given, Garrison took the notes as his own as if by sale from plaintiff, and used them to satisfy his personal obligation to take from the company 2,280 bonds of the company at seventy-five. The knowledge, consent and approval of the plaintiff to such a transaction, would not deprive him of the benefit of the actual transaction which would be the extinguishment of the original indebtedness at least to the extent of the consideration which he, Garrison, named in his books as that for which he bought the notes from the plaintiff
*395 If the “ exchange ” which the plaintiff approved was such as was described by the terms of the resolution in the 38th finding, that must be construed as a contract, would be according to unambiguous terms or its terms if ambiguous as determined by extrinsic circumstances. Referring now to but one of these circumstances, namely, that afterwards iif the transaction, Garrison took these bonds for himself and not for the plaintiff, it seems that the agreement was that the bonds were sold to Garrison, individually, and not acting for the plaintiff as he would act in the mere substitution of the bonds for the notes. If the bonds were to be delivered in part payment of the claim contained in the letter, this would imply, as between all the parties, for by the finding the plaintiff approved, that the claim -was to be deemed extinguished for Garrison’s benefit. This enures to plaintiff’s benefit. Such an extinguishment would discharge his original indebtedness.
Under the circumstances disclosed there was nothing at variance with Mr. Garrison’s former conduct. He had before taken first mortgage bonds at eighty-five cents on the dollar, crediting the plaintiff with that amount. He repeated the operation in kind excepting that he paid less. The evidence shows that he or his agents thought the bonds a better form of security than the notes, The plaintiff, as defendants’ pleadings insist, was without pecuniary responsibility, and there was a certain advantage in not leaving the plaintiff the owner even of a second encumbrance upon the property, as he would have been left if Garrison should hold the bonds simply as a security
The 40th finding, after finding that the “said exchange” was made with the approval of plaintiff, finds that “the said Garrison received and held the said bonds as collateral security in the place and stead of said promissory notes.” It is not found that this *396 receiving and holding by Garrison was with the plaintiff s approval,but there is no doubt that such a finding should be considered as intended.
The testimony does not show that plaintiff ever assented to an arrangement by which, as between himself and Garrison after Garrison had bought the bonds for his own benefit, Garrison should hold the bonds as colleteral security, or in other words that the purchase of the bonds should be formally in Garrison’s name. At the most, plaintiff’s agreement before the resolution was passed, and his presence when it was passed, and his approval then, bound him to nothing more than to the terms of the resolution and to its execution afterwards. By those terms and that execution, Garrison extinguished the collateral notes for his own benefit, and that extinguished the debt for the payment of which the col-laterals were held.
The difference in this case between exchanging the bonds for the notes or the notes for the bonds, and the buying of the bonds by Garrison and paying for the bonds by delivering notes belonging to the plaintiff, is distinct and substantial. The two cases have, in common, nothing more than that physically the two sets of papers are exchanged.
The manner in which the arrangement proposed by the resolution was carried out, according to evidence which the defendants cannot controvert, shows that, so far as Garrison was concerned, and so far as he could bind the plaintiff by his acts, he bought the notes of the plaintiff and then used them to buy the bonds for his own and individual benefit.
It is argued against this position that, for a purchase of the notes, in reality, it was necessary that the plaintiff should have been a cognizant and assenting seller. This will be farther alluded to when the facts are stated, and yet on this point it may be noticed that the justification of Garrison’s conduct *397 in respect of the notes is placed by the learned counsel for the respondent, upon the following positions. He argues that a transfer of interest, proven in the case, which in fact included these notes, and which the referee on the trial held was made as collateral security, although unconditional on its face, “ did have a purpose, and that this was to impart to Garrison unlimited power to use and manage the interests assigned in such manner as he should deem for the best intérests of all the parties.” And again “that Garrison did not hold the notes or any of the other collateral securities upon a strict pledge but that he had full power of using or disposing of them as he deemed proper.” If such were the powers communicated to Garrison, his use of them would bind the plaintiff at least to the extent that such use was beneficial to the plaintiff in extinguishing his prime indebtedness.
It appeared in evidence that Garrison kept a usual set of books of account. In them was an account with “ O. E. Griggs, contractor,” and in it Griggs, or the plaintiff, was charged with the advances made to him by Garrison and which were represented by the promissory notes. Of course, while the notes remained as security only for the payment of the advances, they would not be placed in the account as a credit to plaintiff. They would appear as a credit only when they should yield cash or be treated as cash in payment between the parties.
On May 1, 1883, the plaintiff was credited in the account with $1,546,982.35. The journal, pp. 670, 1616, in explanation of this credit, states the whole amount of the notes andinterest, $2,062,643.13, and then “ Taken from contractor at 75 per cent., $1,546,-982.35”, and this last sum was the above credit in the ledger. There could not be a clearer statement of a sale of the notes by the contractor to Garrison. But the next entry in the journal shows the dispo *398 sition of the difference in the amounts. It is in the interest account. The difference, namely, $515,-. 660.78, is credited to that account, for the discount on the above notes $2,062,643.13, and that difference is further appropriated to Garrison by crediting it to the profit and loss account, and in a subsequent statement of Garrison’s assets the indebtedness of Griggs was stated at a sum which excluded the amount of indebtedness, that on the books was cancelled by the credit of $1,546,982.35.
On the same 1st of Mayt 1883, The Wheeling & Lake Erie Railroad Co., is charged with the whole amount of the notes and interest $2,062,643.13, and credited with seventy-five per cent, of the par value of the 2,280 bonds.
It may be observed here, that this operation gave Garrison the benefit of twenty-five per cent, on the notes and of twenty-five per cent, on the bonds.
It is said that the plaintiff should not have the advantage of the actual transaction proved by the entries in the books, because he knew nothing of the entries and they were not the result of agreement between the parties. It would appear from the findings that the plaintiff knew and approved of the exchange set forth in the findings, but I think it must be considered that the referee meant that this should be taken with a special finding of fact that the plaintiff knew nothing of the making of the entries and that, therefore, he could take nothing by reason of their admission in evidence. As evidence the entries are admissions by Garrison that the facts described by the entries occurred. These admissions are not explained in the evidence. So far as Garrison was capable of doing what he in fact effected, there was a taking of the notes at seventy-five per cent. He had legal power, or the appearance of it, to do what he effected, while at the same time he held the relation to the plaintiff of a trustee. *399 And this relation permits the plaintiff to affirm the conduct of his trustee and take full advantage of it.
In substance, as I think, the transaction involved, among other things, Garrison taking as his debtor for the advances, the railroad company in the place of the plaintiff. This extinguished plaintiff’s indebtedness, at least to the extent of the credit that has already been described. Smith v. Miller, 43 N. Y. 174, citing Southwick v. Sax, 9 Wend. 122 ; Hawks v. Hinchcliff, 17 Barb. 492 ; Gage v. Punchard, 6 Daly, 229.
This result is corroborated by the facts upon which a claim for a further credit than appears on the books is made by the appellant.
The plaintiff’s account in the ledger was, on August 28, 1883, credited with $575,600. This credit as first made was explained by the journal as follows “ Interest account. Dr. to O. E. Griggs, contractor, for the discount of twenty-five per cent, on the amount of the notes of the Wheeling & Lake Erie Co., and interest, May 1, 1883, amounting to $2,062,643.13, which makes up the face value of the notes with interest.” And then were added “ Above entry null and void having been made without proper directions from Mr. O. K. Garrison.” Then a red line was drawn through the figures that stated the amount of the credit, both in the ledger and the journal. It is evident from this that after the former credit was made, Garrison had weighed its significance and in his own mind re-asserted it. As the referee has found substantially that the second credit was inadvertent and not authorized by Garrison, there is sufficient evidence to support it, and the appellant is not entitled to the credit upon the mere fact that it had once appeared in the books and was immediately cancelled.
While I think that, at least, the plaintiff was entitled to be credited in the accounting before the *400 referee with the amount of the first credit and interest to the date of the accounting, I also am convinced that the testimony incontrovertibly showed that the plaintiff was f entitled to a larger credit.
In my opinion the resolution and the subsequent fact, shows a purchase by Garrison of 2,280 second mortgage bonds for his own benefit and not as a substitution for the notes at seventy-five cents on the dollar. If this had been carried out he would have been obliged to pay the company from his own money $1,710,000, but it was further provided that the delivery of the bonds should not be on the receipt of the consideration in money, but to pay in part what was called “ his ” claim against the company. The claim could be “ his” only by considering that the plaintiff had ceased to own it. In reality the claim upon which the notes was founded was money of Garrison, expended upon the railroad. That is, the notes pro tanto were used as money belonging to Garrison. Upon actual delivery for the bonds they became extinguished for Garrison’s benefit in the result to the value of the money that Garrison would otherwise have owed the company for the bonds.- To the extent the collateral security was extinguished the original indebtedness for which the security had been given was extinguished, and for this reason the plaintiff should have had on the accounting a credit of seventy-five per cent, on the par value of the bonds, or, if my calculation be correct, $1,710,000 and interest from May 1, 1883.
The transaction is the same as if the plaintiff had received, as collateral for, or payment of, his advances to the company, bonds of-the company and had then sold them to Garrison at seventy-five cents on the dollar, with consent of the company.
I do not think that any other exception of the plaintiff calls for a direction to correct the account in any other particular. The defendants’ exceptions of *401 course have not been heard on the plaintiff’s appeal.
In consideration of the exhaustive examination of the case by the referee, and the great ability used by him, I have hesitated in coming to the result that has been announced.
The judgment should be reversed and a new trial ordered, and the order of reference vacated with costs to abide the event, unless the defendants by stipulation consent to a deduction from the amount of the judgment recovered by them against the plaintiff of $1,623,667.60 with interest. If such stipulation be given, the judgment is affirmed for the reduced amount, without costs.
Freedman, J., concurred.